UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,


                     -against-

KENRICK BRATHWAITE,

                            Defendant.
------------------------------------------------------------x

                                    REPORT AND
                                    RECOMMENDATION

                                    17-CR-0045 (SJ)

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:

      On January 30, 2017, a grand jury indicted defendant Kenrick Brathwaite

("Brathwaite" or "defendant") and others for conspiring to import cocaine and possess

cocaine with intent to distribute.  See Indictment (Jan. 30, 2017), Electronic Case Filing

Docket Entry ("DE") #1.  Currently pending before this Court, on a referral from the

Honorable Sterling Johnson, Jr., is a motion filed by Brathwaite to suppress his post-arrest

statements and out-of-court "photo array" identifications of him, and to preclude in-court

identification of him by any witnesses who viewed the photo arrays.  See Motion to Suppress

(Jan. 4, 2018) ("Def. Mot."), DE #48.  For the reasons that follow, this Court recommends

that defendant's motion be denied without a hearing.

## FACTUAL BACKGROUND

      The following uncontested facts are drawn from the affidavit of Special Agent Dmitriy

Ioffe, Department of Homeland Security, Homeland Security Investigations ("HSI").  See

Affidavit of Dmitriy Ioffe (Jan. 25, 2018) ("Ioffe Aff."), DE #55-6.  Defendant did not submit

his own affidavit or otherwise respond to the facts recounted in Special Agent Ioffe's affidavit

or the government's brief in opposition.

**Out-of-Court Identifications**

*Witness 1*

On October 6, 2015, in the course of an investigation into a drug trafficking conspiracy involving individuals in Trinidad and the United States, law enforcement officers met with an individual ("Witness 1") who told them that s/he and defendant, whom s/he knew personally and by name, were members of the conspiracy.  See Ioffe Aff. ¶¶ 2, 3.  Witness 1 further told the officers that defendant had recruited him/her to join the conspiracy and that s/he met with defendant and other members of the conspiracy on multiple occasions regarding the drug conspiracy.  See id. ¶ 3.

On December 2, 2015, officers met again with Witness 1 and s/he described his/her and defendant's involvement in the conspiracy, including several meetings s/he had had with defendant in furtherance thereof.  See id. ¶ 4.  At that time, officers showed Witness 1 a photographic array containing six photographs, including one that depicted defendant.  See id.; Govt. Ex. A, DE #55-1.[1]  The officers did not draw Witness 1's attention to, comment on, or otherwise make suggestions about any of the individuals depicted in the photographs.  See Ioffe Aff. ¶ 5.  Witness 1 selected defendant's photograph, identified defendant by name and described his role in the conspiracy.  See id.

*Witness 2*

On February 22, 2017, law enforcement officers met with another individual ("Witness 2") who admitted his/her participation in the conspiracy.  See id. ¶ 6.  Witness 2 identified

---

[1] "Govt. Ex." refers to the specified exhibit to the government's Memorandum in Opposition (Jan. 25, 2018) ("Govt. Opp."), DE #55.

Chanel Stevens as a member of the conspiracy.  See id.  Witness 2 also stated that Chanel Stevens traveled with her boyfriend to Trinidad in furtherance of the conspiracy.  See id.  The officers showed Witness 2 a photographic array consisting of six photographs, including one that depicted defendant.  See id. ¶ 7; Govt. Ex. B, DE #55-2.  Again, the officers did not draw attention to, comment on, or otherwise make suggestions about any of the individuals depicted in the photographic array.  See Ioffe Aff. ¶ 7.  Witness 2 did not identify defendant at that time.  See id.

On April 7, 2017, officers met again with Witness 2.  See id. ¶ 10.  At that meeting, Witness 2 told the officers that at their last meeting on February 22, 2017, s/he recognized defendant in the photographic array as the boyfriend of Chanel Stevens, but did not identify him at that time because s/he had not been positive.  See id.  Witness 2 stated that s/he had met with Chanel Stevens and her boyfriend on several occasions in furtherance of the conspiracy.  See id. ¶ 10.

On April 19, 2017, officers met with Witness 2 again.  See id. ¶ 14.  At this interview, Witness 2 again described multiple meetings with defendant in furtherance of the conspiracy.  See id.

*Witness 3*

Meanwhile, on February 22, 2017, law enforcement officers also met with another individual ("Witness 3") who admitted his/her participation in the conspiracy.  See id. ¶ 8.  The officers showed Witness 3 several photographic arrays, including one containing six photographs, one of which depicted defendant.  See id. ¶ 9; Govt. Ex. C, DE #55-3.  The officers did not draw attention to, comment on, or otherwise make suggestions about any of the

individuals depicted in the arrays.  See Ioffe Aff. ¶ 9.  At that time, Witness 3 did not identify defendant.  See id.

On April 10, 2017, officers met again with Witness 3.  See id. ¶ 11.  At this meeting, Witness 3 advised the officers that at the interview on February 22, 2017, s/he had recognized several individuals depicted in the photographic arrays shown to him/her even though s/he did not identify them.  See id.  S/he asked the officers to show him/her the photographic arrays again.  See id.  As a result, the officers provided Witness 3 with several photographic arrays, including a different photographic array containing six photographs, one of which depicted defendant.  See id. ¶ 12; Govt. Ex. D, DE #55-4.  The officers did not draw attention to, comment on, or otherwise make suggestions about any of the individuals depicted in the photographic arrays.  See Ioffe Aff. ¶ 12.  Witness 3 identified defendant and stated that s/he had seen defendant and Chanel Stevens meeting with Witness 2 as part of the conspiracy.  See id.

On April 18, 2017, officers met with Witness 3 yet again.  See id. ¶ 13.  On this occasion, Witness 3 described meeting with defendant several times as part of the conspiracy. See id.

On May 24, 2017, officers had yet another meeting with Witness 3.  See id. ¶ 15.  At this meeting, Witness 3 again described meeting several times with defendant in furtherance of the conspiracy.  See id.

*Telephone Toll Records*

The government has obtained telephone toll records for Witness 1, Witness 2, Witness 3 and defendant, which reflect numerous contacts between defendant and each of the witnesses.

<u>See</u> <u>id.</u> ¶ 16.

**<u>Custodial Interview</u>**

On March 28, 2017, defendant was arrested by special agents of HSI pursuant to an arrest warrant.  <u>See</u> Govt. Opp. at 3.  After the arrest, HSI agents advised defendant of his rights to counsel and to remain silent, which defendant agreed to waive.  The interview that followed was recorded on video, which the Court has reviewed.  At the beginning of the interview, the following exchange occurred:

| | |
|---|---|
| Special Agent Ioffe: | Uh, Mr. Brathwaite, you are here because you were indicted by a grand jury in the Eastern District of New York for conspiracy to import cocaine and conspiracy to possess with intent to distribute cocaine.  Uh, I'm going to read you your *Miranda* rights.  Or are we- Before I proceed, uh, do you speak English? |
| Defendant: | Yes, I do. |
| . . . | |
| Special Agent Ioffe: | Okay.  Are you currently under the influence of any drugs or alcohol? |
| Defendant: | I took some Nyquil this morning, some calming tea, because I'm sick.  So, I got a fever. |
| . . . | |
| Special Agent Ioffe: | Okay, do you feel lucid?  Do you feel alert? |
| Defendant: | I mean, I'm aware that this is happening but I am a little lackadaisical. |
| Special Agent Ioffe: | Do you feel you're not in a condition to proceed with this interview? |
| Defendant: | No, we should- I'd like to find out more |

|  | about this.  Yes. |
|---|---|
| Special Agent Ioffe: | So you, so you want to proceed? |
| Defendant: | I need to proceed [unintelligible]. |
| Special Agent Ioffe: | Are, are you, do you feel like, so you feel like you're in the right state of mind to proceed? |
| Defendant: | [Unintelligible]. |
| Special Agent Ioffe: | I, just speak up because- |
| Defendant: | Yeah. |
| Special Agent Ioffe: | -this is being recorded.  And I need verbal, uh, I need you to vocalize. |
| Defendant: | Yeah. |

Defendant was then advised of his rights pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).[2]  After advising defendant of his rights, Special Agent Ioffe asked, "Do you wish to proceed with this interview without having an attorney present here with you right now?"  The following exchange then took place:

| Defendant: | It's fine, I'd like to speak to an attorney, but it's f- |
|---|---|
| Special Agent Ioffe: | So, so are you requesting an attorney? |
| Defendant: | I mean I'd like to get my own attorney, yeah. |
| Special Agent Ioffe: | Okay, so my question is- For us to speak to |

---

[2] Special Agent Ioffe advised: "Okay, so before we ask you any questions, it is my duty to advise you of your rights.  You have the right, the right to remain silent.  Anything you say can be used against you in a court of law or other proceedings.  You have the right to consult an attorney before making any statement or answering any questions.  You have the right to have an attorney present with you during questioning.  If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting an attorney."

you, you have to agree that, you have to waive your Miranda rights, uh, which I have just read to you, because there's no attorney present here with you right now.  So, if you're requesting an attorney, that means we're not gonna ask you any questions and this interview will conclude, here.  So, that's, so you're asking for an attorney, yes?

Defendant:                          No, we can continue.

Special Agent Ioffe:                I, I need you to-

Defendant:                          We can continue.

Special Agent Ioffe:                I need you to speak up and I need you to be clear in, in, as to what you're saying.

Defendant:                          I'm sorry, we can continue.

Special Agent Ioffe:                So, so again, you are agreeing to continue this interview without an attorney present?  Am I understanding that correctly?

Defendant:                          Yeah, I'd like to speak to an attorney, but I can continue this-

Special Agent Ioffe:                Okay, look, I'm gonna-

Defendant:                          Because there's not one here.

Special Agent Ioffe:                -look, I'm gonna explain something to you.  So, right now, there's no attorney here with you, obviously.

Defendant:                          I understand that, so [unintelligible].

Special Agent Ioffe:                Right? So, you can, you can-

Defendant:                          [Unintelligible].

Special Agent Ioffe:                -you can, you can, you can-

Defendant:                          We can continue.

| | |
|---|---|
| Special Agent Ioffe: | You can, you can, you can answer some questions and not others.  You can stop the questioning- |
| Defendant: | No, I understand that.  I understand that. |
| Special Agent Ioffe: | -at any time.  So, so when you say I'd like to speak to an attorney.  You'll have, you'll have that opportunity at a later time. |
| Defendant: | I'm sorry for the confusion. |
| Special Agent Ioffe: | Yeah, it's confusing.  So- |
| Defendant: | I'm sorry for the confusion. |
| Special Agent Wilbert: | So you're saying you want to talk to us right now without an attorney present? |
| Defendant: | That's fine. |
| Special Agent Wilbert: | Okay. |
| Special Agent Ioffe: | Alright.  Again so, just so you understand, I'm gonna, you know what? Let me just read you your rights and, if you want to speak to us- |
| Defendant: | Mmhmm. |
| Special Agent Ioffe: | Okay?  After you've thought, after you've understood your rights, just be clear as to what it is you're saying.  Alright? |
| Defendant: | Okay. |
| Special Agent Ioffe: | Because it is a little confusing with the whole thing.  Alright? I'm gonna read you your rights again. |
| Defendant: | Okay. |

At this point in the interview, Special Agent Ioffe advised defendant of his *Miranda* rights using the same language he used earlier.  <u>See</u> *supra* p. 6 n.2.  The following exchange ensued:

| Special Agent Ioffe: | Now, right now, you don't, there's no attorney here- |
| Defendant: | Yes. |
| Special Agent Ioffe: | with you.  Do you wish to speak to us- |
| Defendant: | Yes. |
| Special Agent Ioffe: | -without having an attorney present? |
| Defendant: | Yes. |
| Special Agent Ioffe: | Okay. |

Following this discussion, the HSI special agents interviewed defendant and defendant made several statements, admitting that he was in a relationship with Chanel Stevens and knew Witness 1 and Witness 2, but denying any involvement in or knowledge of drug trafficking or importation.  The interview lasted approximately one hour and fourteen minutes.  Defendant never requested to stop the interview or to speak to an attorney.

## DISCUSSION

### I. Pretrial Identification

#### A. Defendant's Request for a Hearing

As a preliminary matter, an evidentiary hearing regarding identification evidence is not required unless the defendant's moving papers "'are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact' are in

question." United States v. Collymore, No. 16 Cr 521 (CM), 2017 WL 5197287, at *2

(S.D.N.Y. Oct. 20, 2017) (quoting United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992)).

"[A] defendant 'may not baldly request' a hearing into the admissibility of pretrial

identification evidence – commonly known as a *Wade* hearing." United States v. Brown, No.

14-cr-509 (NSR), 2017 WL 825314, at *1 (S.D.N.Y. Mar. 2, 2017) (quoting United States v.

Berganza, No. S(4) 03 CR. 987(DAB), 2005 WL 372045, at *10 (S.D.N.Y. Feb. 16, 2005)).

"Where, as here, [d]efendant's suggestion of impropriety in the presentation of a photo array is

mere speculation, a pretrial hearing into the identification procedures is not warranted."

United States v. Swain, No. S4 08 Cr. 1175(JFK), 2011 WL 4348142, at *7 (S.D.N.Y. Aug.

16, 2011); see United States v. Washington, No. 05-CR-558 (NG), 2006 WL 3359060, at *2

(E.D.N.Y. Nov. 17, 2006).

     Defendant argues that "there is no indication that the photo array identification

procedures were conducted in an appropriate manner or that measures were taken to ensure

that they were not unduly suggestive." Memorandum in Support (Jan. 5, 2018) ("Def.

Mem.") at 3, DE #49. Defendant's primary complaint appears to be that as of the filing of the

motion to suppress, "the Government ha[d] not provided defense counsel with any information

as to the manner in which the photo-array identification procedures were conducted." Id. at 2.

Defendant's complaint rings hollow. As defendant concedes, the government has provided his

counsel with the photo arrays from which witnesses identified defendant. See id. at 3.

Moreover, despite this Court's invitation that he do so, defendant failed to raise any issue in

response to the detailed affidavit of Special Agent Ioffe describing the circumstances of the

identification procedures. See Collymore, 2017 WL 5197287, at *2 (court denies motion to

10

suppress without a hearing, rejecting defendant's argument that he did not know enough about "manner and circumstances" of photo array, where detective's sworn affidavit and a copy of the photo array were produced to defendant); Brown, 2017 WL 825314, at *2 (denying hearing where defendant failed to provide any facts to dispute detective's affidavit describing how identification procedure was conducted); United States v. Adeniyi, No. 03 CR. 0086(LTS), 2003 WL 21146621, at *3 (S.D.N.Y. May 14, 2003) (denying hearing where defendant failed to raise issue with agent's sworn statement describing presentation of photo arrays).

A hearing is not warranted merely because defendant and his counsel were not present during the pre-trial identifications and now wish to develop a factual record. See United States v. Keith, 183 F.Supp.3d 427, 433-34 (S.D.N.Y. 2016); United States v. Salomon-Mendez, 992 F.Supp.2d 340, 343 (S.D.N.Y. 2014); United States v. Williams, No. 13 Cr. 580(JMF), 2014 WL 144920, at *2 (S.D.N.Y. Jan. 15, 2014); United States v. Padilla, No. S1 94 CR. 313 (CSH), 1994 WL 681812, at *8 (S.D.N.Y. Dec. 5, 1994) ("While I can appreciate the difficulties defendants face in discovering whether improper procedures were followed in cases such as this where neither counsel nor their clients were present to view the interaction between the officers and the witnesses, I believe that their suspicion of improprieties may be adequately tested through cross-examination at trial."). In short, defendant's mere speculation that the identification procedures were unduly suggestive, without citation to any facts to support his contention, provides no basis on which to hold a hearing in this case. See Brown, 2017 WL 825314, at *2; Swain, 2011 WL 4348142, at *7. In the absence of any specific allegations of suggestiveness, defendant's recourse is to explore the propriety of the

government's identification procedures through cross-examination at trial.  See Brown, 2017 WL 825314, at *2; Keith, 183 F.Supp.3d at 434; Swain, 2011 WL 4248142, at *7.

**B.    The Merits of Defendant's Challenge**

Notwithstanding defendant's failure to establish his entitlement to a hearing, the Court independently evaluated the suggestiveness of the government's identification procedures.  Due process requires the exclusion of identification testimony that is so unreliable as to create "'a very substantial likelihood of irreparable misidentification.'"  Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  Before concluding that identification evidence is admissible, the court must find either that the pretrial identification procedures were not unduly suggestive or that the identification was independently reliable despite any unnecessarily suggestive procedure.  See id. at 114; Neil v. Biggers, 409 U.S. 188, 199 (1972); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).  If the identification procedure is found to be unduly suggestive, the court must consider whether there is an independent basis for finding that the identification is reliable.  See Manson, 432 U.S. at 110-14; Biggers, 409 U.S. at 199.

**1.    The Identification Procedures**

To determine whether a photographic array is unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array.  See United States v. Thai, 29 F.3d 785, 808 (2d Cir. 1994).  "[T]he principal question is whether the picture of the accused . . . so stood out from all the other photographs as to 'suggest to an identifying witness that [the accused] was more likely to be the culprit.'"  Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (quoting United States v.

Archibald, 734 F.2d 938, 940 (2d Cir. 1984)).

Here, there is nothing suggestive about the number of photographs in the two arrays at issue or the contents of the arrays. See Govt. Exs. A-D.[3] Each photographic array consisted of six photographs, which is an acceptable number for a photographic identification. See United States v. Bennett, 409 F.2d 888, 898-99 (2d Cir. 1969); Washington, 2006 WL 3359060, at *2; Adeniyi, 2003 WL 21146621, at *2. Having reviewed the photographs in each array in which defendant's photo appeared, including the array that Witness 2 viewed when s/he failed to identify defendant, the Court finds that defendant's photograph did not stand out from the other five. All six men in each photographic array are roughly of similar age, complexion, hair color, hairstyle and facial hair. To the extent there are differences in complexion and facial hair among the individuals depicted in the photographs, the differences do not suggest that defendant is more likely to be the culprit. See Salomon-Mendez, 992 F.Supp.2d at 343 (differences in facial hair and hair length were not unduly suggestive); Adeniyi, 2003 WL 2114662, at *2 ("Although the skin tone of Defendant appears slightly different from that of at least four of the other men in the array, the degree of difference is not large, and could as easily be the product of different photographic or image quality as of as [sic] true difference in skin tone, as the clarity and color quality of the images vary somewhat within the array."). Although there are some differences in lighting and how close-up the individuals appear, these differences do not render the array suggestive. See United States v. Bautista, 23 F.3d 726, 731 (2d Cir. 1994) ("While it is true that the photograph of [the

---

[3] Witness 1 was shown Govt. Ex. A, which is identical to Govt. Ex. C, the array first shown to Witness 3; when Witness 3 subsequently asked for another opportunity to review the photographs, s/he was shown Govt. Ex. D, which is identical to Govt. Ex. B, the array shown to Witness 2. See Govt. Opp. at 2-3, 9.

defendant] is slightly brighter and slightly more close-up than the others, we find that these differences did not render the array suggestive."); <u>Brown</u>, 2017 WL 825314, at *2 (difference in lighting does not render array suggestive); <u>Williams</u>, 2014 WL 144920, at *2 ("To be sure, there are some minor differences in lighting, facial hair, and the like among the photographs. But these differences do not render the array suggestive."); <u>Swain</u>, 2011 WL 4348142, at *6 ("Although Defendant's photo is zoomed in so that his head appears slightly bigger than the other subjects' heads, the difference is not so appreciable as to be unduly suggestive.").

As to the procedures used in conducting the identifications, Special Agent Ioffe states in his affidavit that law enforcement officers "did not draw attention to, comment on, or otherwise make suggestions about any of the individuals depicted in the photographic arrays, nor did law enforcement officers indicate that the defendant was depicted in one of the photographs." Ioffe Aff. ¶¶ 5, 7, 9, 12. As to Witness 3, the fact that at his/her request, s/he was shown a second photographic array containing defendant's photo more than one-and-a-half months after s/he failed to identify defendant from the first array, does not render the second array unduly suggestive. While the array shown to Witness 3 on April 10, 2017 contained different fillers than the array Witness 3 viewed on February 22, 2017, "[s]uccessive identification procedures are not per se unduly suggestive, even where the accused is the only common denominator among them." <u>McKinnon v. Superintendent, Great Meadow Corr. Facility</u>, 422 F.App'x 69, 74-75 (2d Cir. 2011) (citing <u>United States v. Concepcion</u>, 983 F.2d 369, 379 (2d Cir. 1992)); <u>Thai</u>, 29 F.3d at 809 (rejecting argument that identification was unduly suggestive where witness selected defendant's photo the day after same witness selected a different person's photo, where witness believed she was viewing different array).

14

As for Witness 2, the pretrial identification procedures resulted in no out-of-court identification to suppress, as Witness 2 failed to make a positive identification of defendant from the photo array.  To the extent that defendant is arguing that any in-court identification by Witness 2 is tainted by the photographic array shown to him/her, as discussed above, that photo array was not unduly suggestive.  Moreover, Witness 2's failure to identify defendant from the photo array goes to the weight of any in-court identification testimony rather than its admissibility.  See United States v. Matthews, 20 F.3d 538, 547 (2d Cir. 1994).

Thus, there is no basis to find that the procedures used were unduly suggestive.  See Brown, 2017 WL 825314, at *2 (relying on review of photo array used and detective's affidavit).

### 2.    The Independent Reliability of the Identifications

In any event, the government has established that the identifications are independently reliable.  See United States v. Finley, 245 F.3d 199, 203-04 (2d Cir. 2001) (affirming district court finding, without a hearing, that government's affidavit contained sufficient facts to establish reliability of identification); Salomon-Mendez, 992 F.Supp.2d at 344 (denying defendants' motions for a pre-trial identification hearing based upon government's proffer "that its identifying witness has had a protracted relationship with both defendants[,]" thereby making a sufficient showing that the in-court identifications would be independently reliable); Berganza, 2005 WL 372045, at *10.  All three witnesses stated that they had met with defendant on multiple occasions in furtherance of the drug conspiracy.  See Ioffe Aff. ¶¶ 3, 4, 10, 12, 13, 14, 15.  In fact, Witness 1 knew defendant personally and by name.  See id. ¶ 3. Witness 3 stated that s/he had seen Witness 2 meeting with defendant and Chanel Stevens in

furtherance of the drug conspiracy.  See id. ¶ 12.  In addition, the government confirmed

through telephone records that each witness was in contact with defendant several times.  See

id. ¶ 16.  Moreover, defendant confirmed in his post-arrest interview that he knew Witness 1

and   Witness 2.  See Govt. Opp. at 8.

Therefore, this Court recommends that defendant's motion to suppress out-of-court

identifications and preclude in-court identifications be denied without a hearing.

## II.    Post-Arrest Statements

Defendant contends that he invoked his right to counsel but was nonetheless improperly

subjected to custodial interrogation thereafter.  See Supplemental Memorandum in Support

(Jan. 5, 2018) ("Def. Supp. Mem.") at 2, DE #51.  The government counters that defendant

did not invoke his right to have counsel present at the interrogation and, on the contrary,

defendant voluntarily waived his right to counsel.  See Govt. Opp. at 13-17.  An evidentiary

hearing is not necessary here since the interrogation was captured on videotape and the

underlying facts are undisputed.  See United States v. Gomez, 17-CR-602 (JMF), 2018 WL

501607, at *3 (S.D.N.Y. Jan. 19, 2018); United States v. McCoy, 14-CR-6181W, 2016 WL

5335443, at *1 n.1 (W.D.N.Y. Sept. 21, 2016), adopted, 2016 WL 6952351 (W.D.N.Y. Nov.

28, 2016).

The Fifth Amendment provides that:  "No person . . . shall be compelled in any

criminal case to be a witness against himself."  U.S. Const. amend. V.  In order to safeguard a

suspect's Fifth Amendment rights, law enforcement agents conducting a custodial interrogation

must advise the suspect that he has the right to remain silent, that any statement he makes may

be used as evidence against him, and that he has the right to have counsel present, either

retained or appointed.  See Stansbury v. California, 511 U.S. 318, 322 (1994); Miranda, 384

U.S. at 444; United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996).  If the suspect

invokes his right to counsel, all questioning must stop until counsel is present or the suspect

reinitiates communications with law enforcement.  See Edwards v. Arizona, 451 U.S. 477,

482 (1981); United States v. Gonzalez, 764 F.3d 159, 165-66 (2d Cir. 2014).

 The request for counsel must, however, be clear and unequivocal.  See Berghuis v.

Thompkins, 560 U.S. 370, 381 (2010) (applying same standard to invocation of right to

remain silent as right to counsel because "[b]oth protect the privilege against compulsory self-

incrimination by requiring an interrogation to cease when either right is invoked") (internal

citations omitted); Davis v. United States, 512 U.S. 452, 459 (1994) (right to counsel).  In

other words, "for a defendant to invoke either the right to remain silent or the right to counsel,

he must do so unambiguously . . . ."  United States v. Plugh, 648 F.3d 118, 128 (2d Cir.

2011).  The request for counsel must be such that it "can reasonably be construed to be an

expression of a desire for the assistance of an attorney *in dealing with custodial interrogation*

*by the police*."  McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (emphasis in original);

accord United States v. Oehne, 698 F.3d 119, 122-23 (2d Cir. 2012) (quoting McNeil).

Courts have therefore found the following statements to be insufficient to qualify as an

unambiguous invocation of the right to counsel: "Maybe I should talk to a lawyer," Davis, 512

U.S. at 462; comment that defendant (who was charged in another case) had a lawyer, Oehne,

698 F.3d at 121-22; "I don't know if I need a lawyer," Plugh, 648 F.3d at 125-27; "Do you

think I need a lawyer?," Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir. 1996); and comment that

suspect "was going to get a lawyer," United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990).

In Connecticut v. Barrett, 479 U.S. 523 (1987), the Supreme Court made clear that a defendant's request for counsel in conjunction with "affirmative announcements" of his willingness to speak with the police does not require suppression of his subsequent statement. See id. at 527-29. In that case, the defendant told officers that he would not give a written statement without an attorney present, but he otherwise indicated that he was willing to talk about the crime with which he was accused. See id. at 525. In concluding that his intentions to speak with the police were clear, the Court noted the importance of "the tenor or sense of a defendant's response to [the *Miranda*] warnings." See id. at 528. Accordingly, the Court reversed the Connecticut Supreme Court's holding that any interrogation after the defendant's limited invocation of his right to counsel was prohibited. See id. at 527-30.

In the instant case, defendant argues that he twice unambiguously invoked his right to counsel. See Supp. Def. Mem. at 2. Defendant's claim is, however, belied by the record. The first statement defendant cites in support is: "'I'd like to speak to an attorney.'" See Supp. Def. Mem. at 2. However, read in its full context, defendant's statement, which was temporally ambiguous, was not a request for counsel to assist in responding to questions by the agents. The defendant's statement was immediately preceded by Special Agent Ioffe's administration of the *Miranda* warnings and the question: "Do you wish to proceed with this interview without having an attorney present here with you right now?" Defendant responded in full: "*It's fine*. I'd like to speak to an attorney, *but it's f-*." Far from making an unequivocal statement requesting counsel for the purpose of the interview, defendant stated that it was "fine" to speak with the agents without an attorney present. See United States v. Oladokun, No. 15-cr-559 (BMC), 2016 WL 4033166, at *4-5 (E.D.N.Y. July 27, 2016)

18

(defendant did not make clear and affirmative invocation where, after "ask[ing] for counsel at two points[,] . . . [he] immediately equivocated"). In fact, at all times during this initial discussion, defendant never intimated that he did not want to speak with the agents without an attorney. See Scarpa, 897 F.2d at 70 (defendant "did not *request* counsel when he stated that he would get a lawyer, nor is there any other indication that he doubted his ability to deal with the government agents on his own") (emphasis in original); United States v. Chavez, No. 3:14-cr-00185 (JAM), 2015 WL 1650838, at *6 (D. Conn. Apr. 14, 2015) (defendant's request for lawyer to read advice-and-waiver-of-rights form was not a request for an attorney to represent him in connection with any questioning); United States v. Newton, No. 11-cr-50, 2012 WL 170008, at *7 (D.Vt. Jan. 19, 2012) (despite defendant's statement that he would not sign a written *Miranda* waiver without an attorney present, "nothing Defendant said or did reflected any intent, request, or expectation that legal counsel would be made available to him prior to or during questioning"); Rushion v. Marshall, No., 07-CV-2093 (SLT), 2010 WL 3938407, at *5 (E.D.N.Y. Sept. 30, 2010) (defendant's statement that "he wanted to speak to a lawyer in the future was not an invocation of his right to counsel at the time of the interview"). Nor did defendant state that he wanted to wait for an attorney to be present before speaking with the agents. See United States v. Lights, 208 F.Supp.3d 568, 575-76 (S.D.N.Y. 2016) (defendant's question, "Can I call a lawyer?," was not invocation of right to counsel where defendant then "indicated that he would like to call an attorney at some point in the future"); United States v. Lifshitz, No. 03 CR. 572(LAP), 2004 WL 2072468, at *10 (S.D.N.Y. Sept. 15, 2004) (placing phone call to attorney was not an unambiguous invocation of right to counsel; "[a]t no time did the defendant state that he wanted to wait for a lawyer to continue

the interview").

In fact, contrary to defendant's current argument, defendant affirmatively told the agents several times that he wanted to talk to them even though he did not have an attorney present.[4]  For example, in response to Special Agent Ioffe's clarifying questions, "so again, you are agreeing to continue this interview without an attorney being present?  Am I understanding that correctly?," defendant stated:  "Yeah, I'd like to speak to an attorney, but I can continue this[.]"  Special Agent Ioffe again sought to confirm that defendant did not intend to invoke his right to counsel, asking, "So you're saying you want to talk to us right now without an attorney present?" -- to which defendant responded, "That's fine."  Thereafter, although not required to do so, Special Agent Ioffe read the full *Miranda* warnings a second time and asked, "Do you wish to speak to us – without having an attorney present?," and defendant responded, "Yes."  See Plugh, 648 F.3d at 126 ("[A]bsent an unambiguous invocation, custodial officers have no obligation to stop questioning *or* to ask only questions intended at clarifying an ambiguous statement.").  Out of an abundance of caution, Special Agent Ioffe appropriately sought to clarify defendant's intentions several times and confirm that he understood his rights.  See Davis, 512 U.S. at 461 ("it will often be good police practice for the interviewing officers to clarify whether or not [the defendant] actually wants an attorney").

Defendant further argues that, in accordance with Smith v. Illinois, 469 U.S. 91 (1984), in determining whether a suspect unambiguously invoked the right to counsel, the court may consider only those statements made before or during the purported request, but not

---

[4] Indeed, even before the exchange concerning his right to counsel, defendant made clear that despite his feeling "lackadaisical," he affirmatively wanted to proceed with the interview, in order "to find out more about this."

statements made after the claimed invocation.  See Supp. Def. Mem. at 2.  In Smith, after having been advised of his right to counsel at the interrogation, the defendant stated: "I'd like to do that."  469 U.S. at 93.  The Supreme Court concluded that the defendant's statement was neither indecisive nor ambiguous and that the courts below had improperly construed the request for counsel as ambiguous only by considering the defendant's subsequent responses to continued questioning.  See id. at 97-98.  Here, in contrast, Brathwaite's initial statement referencing counsel was ambiguous on its face, since he simultaneously stated that "[i]t's fine" to speak to the agents without having an attorney present.  Cf. United States v. Dawes, 495 F.App'x 117, 120 (2d Cir. 2012) (defendant's statement, "I plead the Fifth Commandment," was not "unequivocal invocation of the Fifth Amendment in light of Defendant's nearly simultaneous comments and conduct").  Simply put, where, as here, the defendant's "initial request [for counsel] was ambiguous," Smith "does not apply."  See United States v. Walters, 963 F.Supp.2d 138, 155 n.24 (E.D.N.Y. 2013) (finding request for counsel ambiguous).  The full preliminary exchange between defendant and the agents demonstrates that notwithstanding defendant's initial ambiguous statement, he did not intend to invoke his right to have counsel present at the interview.

In sum, this Court recommends finding that defendant did not invoke his right to counsel.

Although defendant does not contend that his subsequent waiver of his *Miranda* rights was inadequate, the Court will briefly discuss whether defendant waived his rights to remain silent and to counsel.  See generally Plugh, 648 F.3d at 125 (noting that "invocation and waiver are governed by different standards").  A defendant may waive his Fifth Amendment

rights if the waiver is made voluntarily, knowingly and intelligently.  See Moran v. Burbine, 475 U.S. 412, 421 (1986); Miranda, 384 U.S. at 444-45.  In establishing the validity of the waiver, the government must show by a preponderance of the evidence that the defendant voluntarily relinquished his rights and "had a full awareness of the right being waived and of the consequences of waiving the right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995); see Moran, 475 U.S. at 421.  Nevertheless, the government is not required to establish an express waiver of a defendant's *Miranda* rights.  See Berghuis, 560 U.S. at 384.  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." See id.; accord Plugh, 648 F.3d at 127.

As recited above, Special Agent Ioffe read defendant the *Miranda* warnings twice.  The agent also confirmed that defendant understood spoken and written English.  In response to defendant's statements regarding counsel, Ioffe made multiple efforts to clarify defendant's intentions. [5] See Davis, 512 U.S. at 461.  Special Agent Ioffe appropriately limited his questions to clarifying defendant's intent to have counsel represent him and refrained from interrogating defendant until after defendant made clear his intentions with regard to counsel.

---

[5] To the extent that Special Agent Ioffe's statement that "you'll have that opportunity [to consult an attorney] at a later time" could arguably be construed to suggest that defendant did not have the right to consult with counsel prior to or during questioning, any resulting confusion was quickly dispelled, inasmuch as defendant was clearly informed, at least twice, that he had the "right to consult an attorney before making any statement or answering any questions" and the "right to have an attorney present with you during questioning." See Duckworth v. Eagan, 492 U.S. 195, 203-04 (1989) (*Miranda* warnings were sufficient despite inclusion of language that counsel would be appointed "if and when you go to court").  In any event, the second administration of the full *Miranda* warnings to defendant prior to his making any inculpatory statements cured any defective advice previously given to defendant.  See United States v. Bin Laden, 132 F.Supp.2d 168, 192-93, 194 (S.D.N.Y. 2001) (deficiency in advice-of-rights form was cured prior to interview); United States v. Yousef, 925 F.Supp. 1063, 1075 (S.D.N.Y. 1996); see also Oregon v. Elstad, 470 U.S. 298, 309 (1985) (failure to administer warnings does not render subsequent voluntary and informed waiver ineffective).

Defendant confirmed several times that he understood his rights and, before answering any substantive questions, consistently stated that he wanted to proceed with the questioning.  See Ramirez, 79 F.3d at 305 (defendant was given *Miranda* warnings twice, acknowledged his understanding and agreed to speak with officers).  After the second time Special Agent Ioffe formally advised defendant of his *Miranda* rights, defendant was asked, "Do you wish to speak to us – without having an attorney present?"  Defendant responded unequivocally, "Yes."  Defendant acted "in a manner inconsistent with" the exercise of his *Miranda* rights and "made a deliberate choice to relinquish the protection those rights afford."  Berghuis, 560 U.S. at 385.  Moreover, the video shows that the agents did not threaten defendant or coerce him, nor does he claim that they did so.

Thus, the government has demonstrated by a preponderance of the evidence that defendant voluntarily and knowingly waived his *Miranda* rights.

<u>CONCLUSION</u>

For the foregoing reasons, this Court respectfully recommends that defendant's motion to suppress be denied without a hearing.

Any objections to the recommendations contained herein must be filed with Judge Johnson on or before April 10, 2018.  Failure to file objections in a timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).

**SO ORDERED.**

**Dated:      Brooklyn, New York**
**March 27, 2018**

/s/      *Roanne L. Mann*
**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

23